

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 11, 2022

**BY ECF**

Honorable J. Paul Oetken
United States District Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, New York 10007

    Re:    ***United States v. Jose Nouel, a/k/a "Tutu," 19 Cr. 761 (JPO)***

Dear Judge Oetken:

    The Government submits this letter in advance of the sentencing of Jose Nouel (the "defendant"), and in response to the defendant's sentencing submission, dated February 9, 2022 ("Def.'s Mem."). As explained below, the Government respectfully submits that a sentence within the range of 106 to 117 months' imprisonment, as called for by the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G."), should be imposed in this case.

    I.    **Offense Conduct**

        **A.  Background**

    For years, members of the Mac Baller Brims gang (the "Mac Ballers" or the "gang")—a subset of the Bloods—have engaged in rampant drug dealing, firearms offenses, and crimes of violence (including robberies and violent witness retaliation) throughout New York City and elsewhere. *See* United States Probation Office's Presentence Investigation Report ("PSR") ¶ 38. Since at least 2017, members of the "600" and "v7" chapters of the gang have operated at and around East 176th Street and Anthony Avenue in the Mount Hope section of the Bronx, with territory extending up to East 178th Street and west to Walton Avenue. *Id.* ¶¶ 38, 40.

    Working together, these crews sold significant quantities of crack cocaine, as well as quantities of heroin, fentanyl, oxycodone, marijuana, and other controlled substances, and they regulated who else was permitted to sell in the area, including through the collection of "rent." *Id.* ¶¶ 40-41. Members of the gang also trafficked significant drug quantities to other states, including Maine and Virginia. *Id.* ¶¶ 40, 42. In addition, to protect themselves, one another, and their business, members of the gang possessed personal and communal firearms, some of which were stored in stash houses or apartments, sometimes called "traps." *Id.* Members of the gang frequently congregated in these traps and stored, packaged, and sold drugs there. *Id.*

March 11, 2022
Page 2

    In conjunction with their collective drug business, members of the gang also regularly engaged in violence—including shootings, armed robberies, and assaults of bothersome drug customers, potential witnesses who were believed to be assisting law enforcement, and others who crossed them. *Id.* ¶¶ 40, 43. The shootings included back-and-forth violence with members of a rival crew known as "ATM," which operated around East 169th Street and Sheridan Avenue, as well as 2000 Valentine Avenue. *Id.* ¶ 43. For example, on May 17, 2019, Derrick Casado, a/k/a "Big Bank," a/k/a "Papa D," shot ATM associate Jabari Isom-Jenkins, a/k/a "JB Flocca," and on July 18 and 20, 2019, Carlos Rosario, a/k/a "Baby Bottle," attempted to shoot ATM members on East 178th Street and in the courtyard of 2000 Valentine Avenue. *Id.* ¶¶ 9-14.

    Finally, as a matter of course, members of the gang often shouted words and slogans, held up hand signs, wore clothing, and posted content on social media to convey and boast about their connection to the gang. *Id.* ¶ 43. They also frequently used social media and music videos to flaunt the proceeds of their crimes (including cash and cars), display firearms, amass allies, taunt rivals, and intimidate others in the community. *Id.*

    The arrest and incarceration of the defendants in this case has done little to stop them from engaging in near-constant criminal activity, as nearly all of them are known to have engaged in some or all of the following while in Bureau of Prisons custody: possession and use of contraband cellphones to post pictures and messages on social media (including some related to the gang); use of cellphones to communicate with criminal associates (including to identify and threaten cooperating witnesses); assaults on prison staff and other inmates; and possession and use of controlled substances.

## B. The Defendant

    As a member of the Mac Ballers, the defendant sold crack cocaine, heroin, fentanyl, and marijuana in the gang's Bronx territory; and because of his deep and longstanding ties to other dealers around East 178th Street, Mac Baller leaders—including Davon McCullough, a/k/a "Dayday," a/k/a "Young"—permitted the defendant to supply product to other dealers on that block. *Id.* ¶ 45. He was also aware that other members of the gang were routinely trafficking the same substances in the same neighborhood and while on trips out of state. *Id.*

    The defendant also personally possessed, carried, and used firearms, and he knew that other members of the gang did the same. *Id.* ¶ 47. For example, on February 19, 2019, police arrested the defendant after he fled from officers and threw a loaded .380-caliber semiautomatic pistol into a parking lot. *Id.*



March 11, 2022
Page 3

Later, on June 18, 2019, the defendant, his brother (Carlos Rosario), and other Mac Ballers engaged in a large street fight with members of a rival crew known as "ATM," after which they returned to East 178th Street and armed themselves with a gun. *Id.* The defendant gave the gun to Rosario, who then used it to attempt to shoot at approaching ATM members. *Id.* Rosario first tried to shoot while standing in the street, and again tried to fire shots as he fled into a nearby apartment building—the same building the defendant had entered minutes earlier. *Id.*







March 11, 2022
Page 4

Finally, after Rosario and others participated in an armed street robbery in which Rosario shot and killed a victim, the defendant exchanged messages with his brother about the incident, again confirming that the defendant was thoroughly aware of the rampant gun violence that members of the Mac Ballers committed on a daily basis and the terrible consequences of such violence.



Moreover, like many members of the gang, the defendant actively promoted the Mac Ballers and their drug business through social media and music videos. *Id.* ¶ 48. For example, on April 8, 2019, he posted a video of himself smoking marijuana on the stairs of an apartment building, flashing Mac Baller hang signs, and waiving around a large stack of $100 bills.



Two months earlier, in February 2019, he posted another picture in which he and another individual fanned out and displayed massive sums of cash, including a stack of bills sitting by his feet on the floor.

March 11, 2022
Page 5

 

Throughout the summer of 2019, he posted pictures of himself making a Mac Baller hand gesture with the caption "Makkin & Ballin," a picture captioned "EVERYTHING V7" (referring to the V7 set of the gang), and a picture in which he and another individual are seen holding at least six pound-size bags of marijuana.



March 11, 2022
Page 6

The defendant also appeared (alongside co-defendants Casado, Gibril Darboe, Justin Colon, Rosario, Jahuan Pollard, and Juan Tejeda) in the music video for a song called "Mak Talk," which is explicitly about the gang and its drug dealing, gun violence, and territorial conflict:

> They had to let a n**** out the pen [*i.e.*, penitentiary]. I came home in the Ford with some Timbs. I just did three [*i.e.*, years] for a hit [*i.e.*, a shooting]. I shoot your blocko, pass the Glocko [*i.e.*, a Glock handgun] to the bitch. I'm on the block with all my shooters, we gon' spit. A hundred shots off from this choppa, when we spit. . . . Came up on the system, let the .40-cal. hit ya, yeah, I'm a real n****, six figures in the trap. Try to run up, you get clapped [*i.e.*, shot]. Tye gon' hit 'em with the mak. Put that n**** in the back, body bag, n****. You can't trap on the Ave, take these packs [*i.e.*, bags of drug product] n****. He don't got that bread, then he gettin' smacked, n****."

*Id.* ¶ 48 & n.1. In the video, the defendant is seen waiving around cash over the lyrics about selling "packs" on "the Ave," directly linking himself, the gang, and the group's drug proceeds.



Even after being indicted in this case, the defendant has continued to flaunt his gang membership and taunt law enforcement online. On the day of the first District Court appearance in this case—during the two weeks in which the defendant was knowingly a fugitive from this Court—he posted on Instagram a picture of six of his co-defendants with the caption "PRAY 4 GANG THEY GOT COURT TODAY." *Id.* Several people in the picture, including the defendant's brother, are holding up a Mac Ballers hand gesture.



March 11, 2022
Page 7

He also posted a video that featured an image of the indictment, as well as a video in which he is seen dancing with a stack of money, captioned "THE FEDS DID A SWEEP . . . MOOD UNTIL THEY COME & TAKE ME." *Id.*



Once police finally took the defendant into custody, he immediately began using contraband cellphones at the MCC to communicate with criminal associates and post even more pictures and videos of himself, including ones that explicitly reference his gang involvement and connection to drugs. For example, in February 2020, the defendant used a cellphone to broadcast an Instagram Live video in which he made explicit statements indicating membership in the Mac Ballers, flashed the same gang sign as in the photographs above, and rolled and smoked a cigarette that appeared to contain marijuana or K2 synthetic marijuana. *Id.*



The contraband phone use has continued throughout 2022, with his Instagram account showing messages, voice calls, and photographs up through 2020 (the date of the Government's most recent warrant for the account) and public posts of himself and his brother as recently as January 16 and February 10, 2022.

March 11, 2022
Page 8



March 11, 2022
Page 9



Although the use of such phones to post pictures may seem somewhat innocuous, their presence in the jails is a serious problem.  The undersigned has prosecuted a murder-for-hire set in motion via contraband cellphones in federal prison, *see United States v. Guzman-Martinez*, 16 Cr. 418 (KBF); and even in this very case, co-defendant McCullough used a contraband cellphone to send social media messages to a Mac Baller associate identifying and directing the assault of a suspected cooperating witness—an assault that was carried out, resulting in a head injury to the victim that required multiple staples to close.  The defendant's consistent use of cellphones at the MCC—and especially for the purpose of broadcasting his gang membership and drug use—proves his lack of remorse and respect for the law, despite whatever contrition he may present to this Court in the hopes of receiving a lenient sentence.

## II.   The Defendant's Plea and Applicable Guidelines Range

Pursuant to an agreement with the Government, the defendant pled guilty on November 16, 2020, to one count of conspiring to distribute cocaine base, or "crack cocaine," as well as heroin and fentanyl, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C), and to using, carrying, and possessing firearms in connection with that drug trafficking crime, in violation of 18 U.S.C. § 924(c).  PSR ¶¶ 26, 132.  In the plea agreement, the parties stipulated that the advisory Guidelines range for these offenses is 106 to 117 months' imprisonment, based on an offense level of 23 and Criminal History Category of I, and incorporating the 60-month mandatory minimum sentence for the firearms count, which must run consecutive to the sentence on the narcotics count.  *Id.* ¶ 26.  Probation agrees with this calculation.  *Id.* ¶¶ 63-78, 132-34.  Probation also agrees that the defendant is also subject to a mandatory minimum term of 60 months' imprisonment that must be consecutive to any term of imprisonment imposed for any other offense.  *Id.* ¶¶ 132-34.[1]

---

[1] As the Court may be aware, on June 22, 2021, the U.S. Department of Justice provided public testimony in support of the EQUAL Act, S.79.  This proposed legislation would eliminate the powder-to-cocaine base sentencing disparity in 21 U.S.C. §§ 841 and 960.  Although the Department supports elimination of the powder-to-cocaine base disparity, until legislation to that

March 11, 2022
Page 10

## III.  Discussion

### A.  Applicable Law

Although *United States v. Booker*, 543 U.S. 220, 264 (2005), held that the Guidelines are no longer mandatory, it also held that district courts must "consult" the Guidelines and "take them into account" when sentencing.  As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After performing that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," (2) the four legitimate purposes of sentencing, as set forth below, (3) "the kinds of sentences available," (4) the Guidelines range itself, (5) any relevant policy statement by the Sentencing Commission, (6) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," and (7) "the need to provide restitution to any victims."  18 U.S.C. § 3553(a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)   to reflect the seriousness of the offense, to promote respect
        for the law, and to provide just punishment for the offense;
(B)   to afford adequate deterrence to criminal conduct;
(C)   to protect the public from further crimes of the defendant; and

---

effect is passed, the current statutory and guidelines provisions remain in effect.  In this case, the amount of cocaine base attributable to the defendant's criminal conduct is at least 112 but less than 196 grams, which results in a current base offense level of 23 (after the application of acceptance of responsibility points) and a current Stipulated Guidelines sentencing range for this count of 46-57 months' imprisonment, as agreed upon by the parties.  If the powder cocaine Guidelines were instead applied to the same amount of cocaine base, and the Government chose to make the same plea offer to the defendant, the base offense level would be, at most, 13 (after the application of acceptance of responsibility points), and the Guidelines sentencing range for this count would be 12-18 months' imprisonment.  Together with the 60-month mandatory minimum sentence for the firearms count, the total Guidelines sentencing range would be 72-78. The Court can and should, consistent with the law and current sentencing framework, consider the powder-to-cocaine base disparity in assessing the Section 3553(a) factors.  *See Kimbrough v. United States*, 552 U.S. 85, 106-08 (2007); *United States v. Cavera*, 550 F.3d 180, 191-92 (2d Cir. 2008) (en banc).  Based on all the relevant Section 3553(a) factors—including that the defendant's egregious criminal history, significant contact with firearms, and participation in serious acts of violence—the Government believes a sentence within the current stipulated Guidelines sentencing range (106 to 117 months' imprisonment) remains appropriate.

March 11, 2022
Page 11

    (D)   to provide the defendant with needed educational or
             vocational training, medical care, or other correctional
             treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

## B. Analysis

The Government respectfully submits that a sentence within the stipulated Guidelines range of 106 to 117 months' imprisonment is appropriate in light of all of the sentencing factors set forth above, and would be sufficient but not greater than necessary to accomplish the goals of sentencing in this case.

_First_, the nature and circumstances of his offense conduct weigh heavily in favor of a Guidelines sentence. As detailed above, the defendant has long dealt in controlled substances, including fentanyl, and he did so with guns and with other gang members who had guns. He was arrested for possessing a loaded gun; and after being released from that case, he facilitated an attempted shooting by his then-18-year-old brother (Rosario). With every day and week, the members of the Mac Ballers charged in this case became more and more brazen, ultimately resulting in a loss of life. In social media posts and music videos, the defendant has never tried to hide his criminal activity, even after he was indicted and a fugitive in this case. Indeed, he has not stopped even since his arrest and during pretrial detention at the MCC, where he has consistently used a contraband cellphone to further publicize himself and his gang. The defendant and his co-conspirators have already caused immense harm to the community, and it is obvious they have no intention of stopping. Such conduct—ongoing as it is—calls for a serious sentencing consistent with the range called for by the Guidelines.

_Second_, the defendant's history and characteristics likewise weigh heavily in favor of a sentence within the Guidelines range. At 24 years old, the defendant has had at least twelve prior contacts with law enforcement between 2014 and 2018, most stemming from the same narcotics activity at issue in this case, including criminal sale of a controlled substance; criminal possession of crack cocaine and drug paraphernalia with cocaine, heroin, and fentanyl residue; and unlawful possession of marijuana. _See_ PSR ¶¶ 49, 81-86. And as noted above, he was arrested in February 2019 for possession of a loaded firearm. _Id._ These many experiences with law enforcement clearly did not deter the defendant from trafficking in crack, heroin, and fentanyl, and from engaging in armed gang activity with co-conspirators he knew to commit shootings and other extreme acts of violence. Moreover, his continued association with the Mac Ballers while in prison—and his proud displays of that gang membership, conveyed through use of contraband cellphones—proves that he is still committed a criminal livelihood and is thus a serious danger to the community.

The defendant's personal history in no way mitigates his serious offense conduct. He was raised by a "loving and family-oriented" mother, who is lawfully employed at a hospital and provided the defendant a "very good" childhood. _Id._ ¶¶ 88, 92. The defendant was afforded all of the basic necessities, not to mention a weekly allowance after he was fired from or quit all of his legitimate jobs. _Id._ ¶¶ 92, 122-26. The Government agrees with the defendant that his

March 11, 2022
Page 12

neighborhood was "violent and drug-infested," *id.* ¶ 94; however, it bears emphasizing that for several years, *t*he defendant has been a cause of those same circumstances.  He sold heroin.  He possessed guns.  He was a proud and active member of a violent gang.  No matter how it began, the fact is that the defendant  a Guidelines sentence is needed to protect others from his actions and influence.  *Id.* ¶ 94.

Moreover, he committed these crimes even though he had ample ability to do otherwise.  He is a physically and mentally fit young man who was able to work lawful jobs.  *Id.* ¶¶ 106, 108, 122-26.[2]  Nevertheless, he repeatedly lost or left jobs over personal conflicts, and since 2018, he had no income other than a purported $200 allowance from his mother.  *Id.* ¶¶ 122-26.  But despite having negligible legitimate income, the defendant claims that he gambled $400 to $500 each week, lost as much as $2,300 in a day, and spent another $50 a day on marijuana and another $20 to $30 on Perconcet.  *Id.* ¶¶ 110, 112, 115.  If the defendant's claims of drug use and gambling addiciton are accurate, it means he must have been a prolific criminal and earned an enormous sum of money illegally to support his habits.

Although the defendant's submission claims that he "takes full ownership of" his conduct, Def.'s Mem. at 3, it then goes on to blame everyone and everything else for his crimes—from his father's and uncle's own criminal histories, *id.* at 4-5; to being "[s]cared to return" to school, *id.* at 5; to getting arrested on the day of his GED, *id.* at 6; to getting "tormented and bullied" on the street, *id.* at 6; to his outrageously expensive drug and gambling habits (the funding for which is unexplained), *id.* at 7-8.  However, the defendant's own description of his personal history and character cannot be fully credited.

As an initial matter, at least some aspects of the defendant's self-reports are demonstrably untrue.  For example, the defendant's claim that his "7" and "8" tattoos are to commemorate the birth year of his father, *see* PSR ¶ 104—a man who for years at a time "had no presence in Mr. Nouel's life whatsoever" and with whom the defendant "has had no contact . . . in any manner since 2017," Def.'s Mem. at 4—is absurd on its face.  It is readily apparent that "78" is a reference to East 178th Street, where the defendant sold drugs and carried guns with his fellow gang members and other friends.  His social media posts make clear his commitment to that block and his criminal associations there.  For example:

- "**#78**GVNG" in his Instagram profile description:



---

[2] The defendant claims that he intended to take his GED exam in 2016 but was arrested for smoking marijuana instead.  *Id.* ¶ 120.  Never mind the illogic of using drugs immediately before taking a standardized test.  The defendant's criminal history records reflect that he was arrested only once in 2016, *id.* ¶ 81, it occurred at around 2:00 in the afternoon, and he was found to be in possession of *18 individual baggies* of marijuana clearly intended for resale, not personal use.

March 11, 2022
Page 13

- "**178** COMMENTS IM DROPPING THIS [SONG] . . . #V7 #TRENDS **#78** #GCMG [Guap City Money Getters] #MBR [Money Bitches Respect] #KILLALLRATS" on a post about a music track he had recorded:



- A comment "**78 BLOCK** DO IT BEST" on a post about hosting a neighborhood cookout:



- Being "tagged" in a friend's post that says, "SHOUT @TUTU.TRENDS [the defendant] FOR DOIN SOME FOR THE **H78D** [*i.e.*, 'hood' with '78' in the middle] EVEN THO THE [POLICE] SUCCIN DICC."



March 11, 2022
Page 14

- **"78"** posted under a picture of Jaquan Clark, a/k/a "JJ," who had historical family ties to Anthony Avenue but lived in North Carolina, where he was charged with murder in connection with the drive-by killing of a 74-year-old woman.[3]



It is also not accurate to say that the defendant's travel to the Dominican Republic shows that he sought to distance himself from "the negative influences of his environment" in the Bronx. Def.'s Mem. at 8. Even while in this "supportive environment [in the D.R.] with no access to the drugs," the defendant still opted to hold himself out online as being constantly armed with deadly weapons. In a picture posted November 9, 2018, he is seen sitting in the water holding a handgun with the caption "DR LIFE . . . POLED UP EVERYWHERE I GO OVER THERE."



In other videos, he acts with total impunity in the face of police. For example, in a video, posted May 30, 2019, he and friends taunt police who are attempting to make an arrest, then they open the door of the police car and allow the arrestee to run away while they scream "EWOK!"



---

[3] https://myfox8.com/news/man-charged-with-murder-in-connection-with-death-of-74-year-old-high-point-grandmother/

March 11, 2022
Page 15

In another video posted August 1, 2019, the defendant is walking down the sidewalk, shouting at a police officer, "Next time I see you without that badge, I'm gonna smack the shit out of you, n****, and that's on my mother!  I catch you outside without that badge, I'm gonna smack that smirk of your face, f****t!"  The caption reads "THIS IS HOW YOU GOTTA TALK TO THESE BITCH ASS COPS. N****S LOVE HARASSING US SHITS CRAZY."



At every opportunity, the defendant held himself out as a model for others—proof of how much money and popularity one can acquire by committing crimes, berating law enforcement officers, and mocking the justice system.

To the extent the defendant's PSR, sentencing memorandum, and mitigation report portray him in a different light, the Court should scrutinize those documents.  It is important for the Court to appreciate how the defendant *actually behaved* in the years leading up to his arrest, including his disrespect—if not outright contempt—for the law.

*Third*, a sentence within the Guidelines range is needed to adequately punish the defendant and to demonstrate the seriousness of his conduct.  As noted above, the crimes at issue here have seriously harmed an unknown number of drug users and addicts, not to mention the thousands of citizens forced to navigate life in the Mac Ballers' territory, knowing that a gang member may commit another shooting, slashing, robbery, or assault at any time.  A Guidelines sentence is also needed to promote respect for the law and deter the defendant from future crimes—a goal that was not accomplished by any of his prior arrests or contacts with law enforcement, his indictment in this case, or even his incarceration at the MCC, where he has boasted his gang membership and engaged in contraband offenses.  Moreover, looking beyond the defendant himself, in a case like this, where the defendant was involved in a much larger gang and drug conspiracy that operated out in the open, there is a very significant need to deter others by showing that such crimes will result in a substantial sentences when prosecuted in federal court.  It is clear from all of the defendants' criminal histories in this case—and in others like it—that state prosecutions and lenient sentences do not adequately deter them.  Even federal charges alone do not deter them.  A federal *sentence* must send a starkly different message.  A Guidelines sentence is also necessary to avoid unwarranted disparities between this defendant

March 11, 2022
Page 16

and his co-defendants.  This defendant was older, sold *and supplied* multiple and dangerous drug types (including fentanyl), and was involved in several firearms incidents.  His sentence must reflect his relative culpability.  Lastly, and most importantly, Guidelines sentences in this case are essential to protect the public from the defendant, his co-conspirators, and a resurgence of the 600 and v7 Mac Ballers on Anthony Avenue.

A 60-month sentence—or anything close to it—will not accomplish the goals of sentencing.  In fact, the defendant boasts about the fact that he will be sentenced to more.  In a January 1, 2022 Instagram post, the defendant put up a picture of himself and his brother, both holding up Mac Baller gang signs, with a caption that includes "ME PLUS YOU WE TOOK 35 [YEARS.] 2 OTHER N****S IN OUR SHOES WOULDVE TESTIFIED."  His brother, Rosario, pled guilty under an agreement with a Guidelines sentence of 25 years' imprisonment, meaning the defendant was bragging about taking a 10-year plea, rather than cooperating with law enforcement.



The defendant's past encounters with the justice system have only emboldened him to continue breaking the law and taunting the police.  For example, on September 24, 2019, he posted "I Just Got Caught With The Weapon[.] Beat The Case I Ain't Stay In Corrections[.] Got Me A Lawyer[,] No I Ain't Telling . . . #THEGOLDEN CHILD."



A lenient sentence here will do the same thing.

March 11, 2022
Page 17

*Finally*, COVID-19 and other conditions at the MCC do not warrant the dramatic sentence reduction the defendant is seeking.  As an initial matter, the defense submission cites an Amnesty International letter from 2011 but overstates the letter's message.  The letter *did not* find that conditions at the entire MCC facility "amounted to cruel and inhuman treatment," *contra* Def.'s Mem. at 17; rather, it discussed only the MCC's Special Housing Unit on the 10th floor, reserved for terrorists and other exceedingly dangerous inmates.  *See* https://www.amnesty.org/en/documents/AMR51/029/2011/en/.  The defense submission then goes on to cite the executive director of the Federal Defenders of New York, whose stated mission is to achieve the acquittal of defendants and release of inmates.  His unsupported opinion about prison conditions is of little evidentiary value when assessing this defendant.  When considering the goals of promoting respect for the law, deterring wrongdoing, and protecting the public, a more significant data point is that this City is experiencing its worst period of gun violence in years, and releasing a defendant with a history of gun possession who was still flouting the law while in jail will not help.  Accordingly, although this Court has already taken the consistent position that time in custody during COVID warrants additional consideration, that consideration is dwarfed by the defendant's flagrant and consistent disrespect for the law and commitment is continuing his criminal behavior.

## IV.    Conclusion

For the foregoing reasons, the Government respectfully requests that the Court impose a sentence within the stipulated Guidelines range of 106 to 117 months' imprisonment.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By: _____
Frank J. Balsamello / Jamie Bagliebter
   Peter Davis
Assistant United States Attorneys
(212) 637-2325 / -2236 / -2468

cc:    Angus James Bell, Esq., and Carlos M. Santiago, Jr., Esq.
       *Counsel for defendant Jose Nouel* (by ECF)